U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**



Signed December 7, 2007 _____
United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| IN RE: | § |
|  | § |
|  | § |
| MICHAEL WHITE and | §     CASE NO. 06-32324-SGJ-13 |
| BRENDA JOYCE WHITE, f/k/a | § |
| BRENDA J. MCCUIN, | § |
|      D E B T O R S. | § |

<u>MEMORANDUM OPINION AND ORDER: (A) DISCHARGING SHOW CAUSE ORDER AS TO DEBTORS; (B) ORDERING NORTH AMERICAN FORECLOSURE, LLP, DAVID CURTIS, AND JIREH CAPITAL SERVICES, LLC TO APPEAR BEFORE THIS COURT AND SHOW CAUSE WHETHER THEY HAVE COMMITTED ACTS IN VIOLATION OF THE AUTOMATIC STAY AND SHOULD PAY DAMAGES PURSUANT TO SECTION 362(k); AND (C) GRANTING RELATED RELIEF</u>

The following is the ruling of this court in connection with an Order for Debtors to Appear and Show Cause ("Show Cause Order") [doc. no. 56] issued in the above-referenced case. As described below, this Show Cause Matter (herein so called) involves: (a) two desperate Debtors trying to save a homestead; (b) a mortgage lender on the homestead, seeking to protect its legal rights and economic position in the face of multiple

defaults by the Debtors; and (c) unrelated actors in the middle, who appear to be unscrupulously taking advantage of people (*e.g.*, the Debtors, the lender, and unwitting third parties whose names and personal information are available on public data bases[1]) during a home mortgage foreclosure crisis of epic proportions.

## FINDINGS OF FACTS

1.   Michael and Brenda Joyce White, formerly known as Brenda J. McCuin (the "Debtors," or the "Whites," or "Mr. and Mrs. White") filed a voluntary Chapter 13 bankruptcy case on June 6, 2006.[2]

2.   The Debtors filed bankruptcy to try to save their home at 925 Creek Valley Road, Mesquite, Texas 75181 (hereinafter, "Homestead").

3.   An entity known as HomEq Servicing Corporation, as Servicer for Wells Fargo Bank, N.A., as Trustee under a Pooling and Servicing Agreement dated as of March 1, 2004 [with] Merrill Lynch Mortgage Investors Trust Mortgage Loan Asset-Backed Certificates, Series 2004-WMC2, their Successors and/or Assigns (hereinafter, "HomEq") has, during the bankruptcy case, asserted

---

[1] As later explained, the "unwitting third parties" are individuals who are the subject of bankruptcy cases in far away venues, whose  cases are a matter of public record, and whose case information is readily available to anyone who might want to view it through internet/online resources.

[2] The Debtors filed a previous Chapter 13 bankruptcy case on April 4, 2005, Case No. 05-33661-HDH-13, which was dismissed without a discharge on March 29, 2006.

a secured claim against the Whites and a lien on the Homestead, pursuant to an Adjustable Rate Note in the original principal amount of $95,920, dated September 29, 2003 ("Note"), and a Deed of Trust also dated September 29, 2003, both of which were executed by the Whites, were duly recorded, and later assigned to HomEq. (*See* Ex. C-1.)[3]

4.  The Debtors defaulted on their obligations to HomEq by failing to make payments required under the Note.  Shortly after the Whites filed their current bankruptcy case, HomEq filed a motion for relief from the automatic stay [doc. no. 24] to pursue its state law remedies with regard to the Homestead.  Then, on September 29, 2006, an Agreed Order Modifying Automatic Stay [doc. no. 37] was entered with respect to the Homestead. (*See* Ex. C-2.)  The Agreed Order provided, among other things, that the automatic stay as to the Homestead would continue so long as the Debtors resumed normal monthly mortgage payments and cured their arrearages to HomEq pursuant to certain terms.  The Agreed Order contained certain provisions requiring notice to the Debtors and opportunity to cure, in the event of a subsequent default by the Debtors under the Agreed Order.

5.  The Debtors, unfortunately, failed to comply with the terms of the Agreed Order.  On December 7, 2006, HomEq filed a

---

[3] There is also a second note secured by the Homestead in the amount of $23,980.  (*See* Ex. C-1.)

Certificate of Default [doc. no 44] notifying the Debtors, parties in interest, and the court that the Whites had defaulted under the Agreed Order; had been given notice of the default and opportunity to cure the default; but the Debtors had failed to cure. (*See* Ex. C-3.)  Thus, the automatic stay of the Whites' bankruptcy was terminated as to HomEq, in December 2006, pursuant to the specific terms of the Agreed Order.

6.  Soon thereafter, HomEq noticed the Whites that there would be a nonjudicial foreclosure sale on the Homestead on February 6, 2007. (*See* Ex. C-4.)  However, some intervening events occurred in January 2007 that are disturbing but not unfamiliar to this court.

**A.    The Fictitious Conveyance of a 1% Interest in the Homestead on the Eve of Foreclosure**

7.  Prior to the scheduled foreclosure, Mr. White executed a document entitled "Warranty Deed," indicating that he had conveyed a 1% interest in the Homestead to an individual named Chaka Casey on January 2, 2007. (*See* Ex. C-5.)  On January 4, 2007, the grantee, Chaka Casey, filed a bankruptcy case in the United States Bankruptcy Court for the Central District of California, Los Angeles Division, Case No. 07-10064-AA.  Oddly, Chaka Casey did not list in her Bankruptcy Schedules the 1% property interest in the Homestead that she had allegedly been deeded just 2-days prepetition.  (*See* Ex. C-10.)

4

8.   In any event, on February 6, 2007—the date of the scheduled foreclosure sale—HomEq received, via facsimile communication, the document entitled Warranty Deed reflecting the 1% interest of Chaka Casey, along with the Chaka Casey bankruptcy petition.  The facsimile cover sheet showed that the facsimile was sent from someone named "Jason" and the transmission trail at the top showed the facsimile machine was that of a "Sally Wilson."  The totality of evidence at the Show Cause Hearing overwhelmingly suggested that the Warranty Deed was backdated to January 2, 2007 and was really prepared in February (since, among other things, the notary signature appears to indicate that Mr. White appeared before the notary and signed the document on February 2, 2007).[4]  In any event, despite the questionable validity and effect of the Warranty Deed document, and despite the mysterious manner of its delivery (from anonymous senders), HomEq did what one might hope any prudent creditor would do: it took no further action with regard to its collection efforts as to the Homestead (*i.e.,* it did not record the substitute trustee's deed reflecting the foreclosure sale that had already occurred earlier in the day) out of concern over the implications of the Chaka Casey bankruptcy case and the automatic stay as to her alleged 1% interest.

---

[4] Email evidence also suggested that the Warranty Deed was executed in early February 2007. (*See* Ex. D-A.)

9.  HomEq soon made contact with Chaka Casey, who was a *pro se* debtor.  Ms. Casey credibly represented (in fact later provided a sworn affidavit which this court accepted into evidence[5]) (*see* Ex. C-6) that she does not know the Whites, had absolutely no knowledge of the alleged 1% conveyance,[6] and did not now or ever claim an interest in the Homestead.  The evidence was that Chaka Casey was quite upset about the impact of these events on her own bankruptcy case.

10.  HomEq brought these matters to the court's attention in a Motion Requesting Show Cause Order, which prompted this court to indeed issue the Show Cause Order [doc. no. 56], requiring the Whites to appear at a scheduled hearing ("Show Cause Hearing") and explain this series of events.  The Whites did, indeed, appear at the Show Cause Hearing (represented by their counsel) and quite candidly and cooperatively testified.  In fact, the court heard a wealth of evidence at the Show Cause Hearing (through both the Debtors and HomEq) that the court found both credible and disturbing.

---

[5]There were no objections, Ms. Casey is not within the subpoena power of this court, and the affidavit's trustworthiness appeared in all ways reliable.

[6]Note that the Warranty Deed does not contain Chaka Casey's signature—just the alleged grantor's, Mr. White's (*see* Ex. C-5).

**B. The Phenomenon of Fraudulently Conveying a Fractional Interest in a Homestead to an Unwitting Stranger in Bankruptcy to Forestall Foreclosure.**

11. HomEq credibly represented that the 1% ownership transfer of the Homestead in the case at bar is not an isolated incident. The transfer is merely but one of a stream of conveyances orchestrated by a person or group of persons (whom this court will refer to as "Bankruptcy Servicers"—for lack of a better term) who take great strides to remain anonymous.

12. Specifically, several times a month, HomEq will have this same type of event occur: the conveyance of a fractional interest in a homestead to some debtor in California (usually a *pro se* debtor in a Chapter 7 bankruptcy case in the Central District of California, Los Angeles Division) on the eve of a foreclosure, with a facsimile notification from "Jason" from the "Sally Wilson" facsimile machine. HomEq's counsel described this credibly as "an ongoing occurrence."

13. If this were the end of the story, a compassionate (and naive) person might simply think "desperate times call for desperate measures," and these are simply desperate and unsophisticated people who are trying anything they can to stave off foreclosures (when the bankruptcy process has not afforded them the relief they thought it might). It might seem as though the worst thing that has happened here is that a mortgage lender has had to wait an extra month or so to finalize foreclosure on

7

the Whites' house (and maybe a few other families' houses every once in a while).

14. But here is the rest of the story.

**C. A New Cottage Industry of Bottom Feeders: For Every Action (*i.e.,* Foreclosure Crisis) there is an Opposite Reaction (*i.e.,* Folks Trying to Make a Buck).**

15. The Whites testified (similar to other debtors this court has heard on a few occasions in other cases) that, starting in mid-December 2006 (around the time that they defaulted under the Agreed Order and their Homestead was posted for foreclosure), that they began receiving numerous letters/solicitations from companies in the mail regarding ways to prevent the upcoming foreclosure on their Homestead. Sometimes they would receive 8 to 12 of these solicitations per day (*e.g.,* from "foreclosure specialists" offering to stop foreclosure without bankruptcy). Mr. White estimated he probably received solicitations from 40 such companies. The Debtors, assuming that these were legitimate companies with possible solutions, called the phone numbers shown on various of these mailings (Mr. White estimated calling 5 to 6 companies, all of which charged large fees for their "services"—some as high as $2,000 per month). The Whites proceeded to deal with a company called North American Foreclosure (whose literature they had received in the mail) and

an individual there who called himself "Jeremy" or "Jason."[7]

16. Jeremy or Jason (with whom Mr. White spoke 10 to 12 times) explained to the Debtors that he could help them with a "completely legal" procedure to stop foreclosure on their Homestead. *See* Mr. White Affidavit, dated May 9, 2007, ¶ 4 [doc. no. 58] & Mr. White's live testimony from Show Cause Hearing.

17. Jeremy or Jason explained[8] that the Whites could convey a 1% interest in their Homestead to *the company* (presumably North American Foreclosure or some company it formed) and *the company* would file bankruptcy in California and stop the foreclosure (since a 1% ownership in the Homestead would then be owned by a company in bankruptcy with a new automatic stay). The Whites would then be required to "pay back" the 1% interest by paying the company $650 per month until the 1% interest was paid back (this is not a typographical or other error; this was, in fact, the strategy as Mr. White described it). Of this $650 per month,

---

[7] Mr. White has interchangeably referred to dealing with both a "Jeremy" and a "Jason" in both written pleadings and in sworn testimony. The court interprets the totality of evidence to suggest that there was both a Jeremy and Jason involved in the Whites' case and that perhaps Mr. White could not always keep straight which one he dealt with at which time.

[8] The court notes that some of the evidence described herein was arguably hearsay. Not only was no objection made, but none of it was offered to prove the truth of the matter asserted, but rather to explain the Debtors' conduct, in response to the court's Show Cause Order. Moreover, there was documentary evidence in this matter to corroborate much of the testimony.

a portion would allegedly go to HomEq.[9]  Jeremy or Jason also suggested that monies would get distributed through the bankruptcy case in California.  Mr. White never met Chaka Casey. He believed Chaka Casey was a "representative of the company."

18.  The mysterious Jeremy/Jason implied that he was located in California (at the company's main office),[10] but that the company had contacts or people in the field in the Dallas-area (namely a David Curtis with Jireh Capital Services, LLC)[11] that could come directly to the Whites' residence and meet with them about implementing this strategy.  The Whites, trusting that this was all a legal strategy, proceeded to deal with David Curtis, who (after some initial phone contact) came to the Whites' residence and further assured them of the legality and proven

---

[9] HomEq's lawyer represented at the Show Cause Hearing that no monies were ever forwarded to HomEq.

[10] Documentary evidence (*i.e.,* the form of Client Agreement submitted by the Whites) showed the following contact information:  North American Foreclosure, Foreclosure Specialists, 2700 S. Figueroa St., 11th Floor, Los Angeles, CA 90007-3256.  (*See* Ex. D-A, p. 3)  Mr. White also testified that Jeremy/Jason's phone number had a "201" area code.

[11] *See*  Ex. D-B, which is a business card Mr. White was given by David Curtis, President, of Jireh Capital Services, LLC, at [?]20 N. Joe Wilson Suite., 1412, Cedar Hill, TX 75104.  The card gives phone, facsimile, and email information, along with a logo indicating that Jireh is a member of the Dallas/Northeast Texas Better Business Bureau.  *See also* Ex. C-8 (www.myspace.com page for a David Curtis, President of Jireh Capital Services, LLC, Cedar Hill, Texas).  *See also* Ex. C-9 (a Better Business Bureau listing for Jireh Capital Services, LLC at 1431 Greenway Drive, Suite 800, Irving, Texas 75038).

success of this strategy.

19. Shortly after the initial David Curtis meeting, the Whites decided to embark upon this strategy. David Curtis emailed the Whites a Client Agreement and the form of Warranty Deed on February 1, 2007 (*see* Ex. D-A), and then soon thereafter, David Curtis came to the Debtors' residence,[12] and brought original documents out for the Debtors to sign, the Debtors signed them and had them notarized, and David Curtis took the original documents back with him. The Whites delivered to David Curtis $650 cash as the first payment that the Whites owed, pursuant to the Client Agreement, for implementation of this strategy.[13]

20. The Debtors were promised a follow up progress report

---

[12] Mr. White's exact testimony was that David Curtis paid several visits to the White's house, allegedly for their convenience, and the Whites never went to or knew where David Curtis' offices were.

[13] The Client Agreement provided to the Whites (*see* Ex. D-A, pp. 3-4) required, at Section C, that the clients/Whites pay a $650 monthly service fee on the first of every month "in CASH, and made via Western Union;" that this was a monthly fee to suspend foreclosure "for as long as the client requires our services. Only [a] small portion of this monthly fee is paid to the lender;" and the Client Agreement also provided that the Whites were required to "cease all further contact with the Lender/Parties initiating the Foreclosure process." The Client Agreement goes on to provide for assessment of certain other types of fees occasionally, including "late fees" and "reinstatement fees" (Section E) and that "The foreclosure process can be delayed six (6) to thirty-six (36) months. The eviction process can be delayed three (3) to six (6) months." (Section F).

from David and/or Jeremy in the next 24 to 48 hours, to confirm foreclosure had been stopped.  The Debtors were supposed to continue to pay $650 per month for however long the company's services were needed.  The Debtors made one more $650 payment to David Curtis.  The third payment was never made, because Debtors' counsel contacted the Debtors about this Show Cause Matter and, at that point, the Debtors realized there was a problem.

21.  Mr. White testified that he has attempted to reach Jeremy and David subsequently and all contact numbers are disconnected.

22.  There is credible documentary evidence for much of what is described herein, including: (a) Email correspondence dated February 1, 2007 to Mr. White from a David Curtis from Jireh Capital Services, LLC (showing phone, facsimile and email contact information and also an advertisement for Jireh Capital Services as "Providing fair and honest home solutions since 2003") (Ex. D-A, p. 1); (b) the form of Client Agreement provided to the Whites from North American Foreclosure, LLP  (Ex. D-A, pp. 3-4); (c) two receipts from David Curtis (one dated February 3, 2007 and one dated March 31, 2007), indicating his receipt of the two $650 payments made by the Whites  (Ex. D-A, pp. 6-7); and (d) a cancelled check from the Whites' Guaranty Bank checking account in the amount of $650, made payable to David Curtis, dated March 31, 2007 and cashed by David Curtis on April 5, 2007 (the back of

12

the check was included in evidence, with David Curtis' signature and deposit information reflected) (doc. no. 64—submitted at court's request post-hearing).[14]

23. This court is satisfied that the Whites have been naively duped in this matter and have not themselves knowingly or fraudulently participated in acts that might be described as a bankruptcy crime. See 18 U.S.C. §§ 152 and 157. At worst, they appear to be "bit characters" in a scheme to defraud borrowers and lenders alike who are in the midst of foreclosure proceedings. The court heard credible evidence that the Whites did not consult with their bankruptcy counsel—believing that all options had been exhausted in their case with the termination of their automatic stay. The court also believes Mr. White's testimony that he assumed this whole Jeremy/Jason strategy was legal and that it would "buy" him some time to save his house.[15] There was further credible evidence that Mr. White was injured in

---

[14] Even though the Client Agreement required cash payments delivered via Western Union, Mr. White made both payments directly to David Curtis in person (as evidenced by two receipts) and one such payment was by *check* to David Curtis, which Mr. Curtis accepted and negotiated—creating a paper trail Mr. Curtis may live to regret.

[15] Mr. White was questioned at length regarding his belief in the legality of this strategy. Mr. White testified credibly that David Curtis convinced him that, since documents were being notarized and filed in the California Bankruptcy Court, that it was all legal. Of course, nothing that this court is aware of was filed in the California Bankruptcy Court.

a car wreck with a commercial vehicle, had surgery on his shoulder, and was expecting an imminent settlement from the accident, at the time of all of these manueverings, and that he believed the settlement proceeds would eventually help him catch up arrears on his home—thus, the need to "buy" some time. Unfortunately, the settlement ultimately resulted in only $2,000 to the Debtors—which was not enough to help with the Homestead arrearages.

24. As previously mentioned, HomEq credibly represented to the court that a similar scenario as that described herein (*i.e.*, facsimiles from "Jason/Sally Wilson" on the eve or day of foreclosure, showing a conveyance of a fractional interest in real property on the eve of foreclosure from a borrower to some random *pro se* debtor in California) occurs with regard to a HomEq scheduled foreclosure multiple times per month.[16] It is a

---

[16] HomEq provided as additional evidence a transcript of a hearing that occurred March 8, 2007, in a matter styled *Homecomings Financial, LLC f/k/a Homecomings Financial Network, Inc. v. Clifford Chandler, et al.,* Cause No. CC-07-02498-A, County Court at Law No. 1, Dallas County, Texas. Ex. C-7. Sworn testimony from some homeowners, the Chandlers, in that matter, reads eerily similar to the testimony that this court heard from the Whites. The Chandler testimony reveals that the Chandlers, after getting deluged with mail when their home was posted for foreclosure (from various companies that alleged they could help the Chandlers), ultimately decided to deal with a "Jeremy" at a company called "Time Lenders" and/or "Foreclosure Solutions" (the Chandlers also dealt with individuals associated with Time Lenders named Robert Paulson and Dr. Frank Ford; one of the individuals in this scenario was from Rowlett, Texas). The Chandlers described that a homeowner must call Jeremy and wait for a call back (always from a private number). The Chandlers

14

scheme, HomEq says, that many people in the industry are aware
of, but perhaps no one is "connecting all the dots" and pursuing
the perpetrators—the bottom feeding "Bankruptcy Servicers."[17]
According to HomEq, many times, evidence of these schemes only
gets developed at the "end of the road," so to
speak—specifically, at eviction proceedings involving the
borrowers/debtors well after foreclosure—and such eviction
proceedings occur before Justices of the Peace, whose courts are
not courts of record (and such Justices of the Peace do not
always feel comfortable interpreting the bankruptcy automatic
stay).

---

described representations to them made by Time Lenders that it
could forestall foreclosure on their home up to three years. The
Chandlers purportedly conveyed a 1% interest in their home
through a Warranty Deed, to a Mr. Keith Ward (a complete stranger
to the Chandlers who, as it turns out, was a debtor in bankruptcy
case #1:06-bk-12037-KT in the Central District of California, Los
Angeles Division). Ex. C-7 (last 3 pages). The Chandlers simply
signed documents they were sent by facsimile and instructed to
sign by Time Lenders. The Chandlers testified that they paid
$600 per month to Time Lenders from June 2006 through February
2007. The Chandlers' description of conversations they had with
Jeremy and Time Lenders sounds disturbingly like legal advice was
being given by nonlawyers to the Chandlers (including advice
regarding how to handle an appeal of an eviction order). Ex. C-
7, p. 14.

[17] This court has some general awareness of the "fractional
interest conveyance scheme" from proceedings before it in the
matter of *In re Evelyn Corley*, Bankruptcy Case No. 06-32758-SGJ-
13 (Aug. 18, 2006 hearing transcript). This court has even seen
the name "David Curtis" come up before as a person who offers
assistance to debtors facing foreclosure. *See In re Sammie Lee
and Monta Netta Chance*, Case No. 02-36551, Transcript of
Proceedings 3/31/05 [doc. no. 76], p.7, line 14.

## CONCLUSIONS

Congress, in recent years, has taken significant strides to put an end to the problem of unscrupulous bankruptcy petition preparers.  See 11 U.S.C. § 110.  A bankruptcy petition preparer is defined at section 110 as "a person, other than an attorney for the debtor or an employee of such attorney under the direct supervision of such attorney, *who prepares for compensation a document for filing*" and "document for filing" means "a petition or *any other document prepared for filing by a debtor in a United States bankruptcy court* or a United States district court in connection with a case under this title."  (All emphases added.)  Section 110 goes on to require the bankruptcy petition preparer to make certain disclosures on any documents filed with the court and also to the debtor on a prescribed form of notice indicating that the bankruptcy preparer is not an attorney and may not give legal advice (which must be signed by the debtor).  Section 110(e) goes on to provide the means for a debtor, creditor, trustee or U.S. Trustee to file an action in the bankruptcy court to enjoin the bankruptcy preparer from engaging in conduct in violation of Section 110 and damages may also be awarded in the action.

This court is not convinced that the conduct that was described in the Show Cause Hearing fits neatly within Section

110. Moreover, no section 110 action has been initiated before this court. It may be that Congress has not specifically described or proscribed in section 110 the exact activity involved in the case at bar. However, this court is confident that there are tools available under the law (some available to this court, some not) to deal with actors in the system like the elusive Jason/Jeremy, David Curtis, North American Foreclosure, LLP and Jireh Capital Services.

**ORDER**

Accordingly, based on the findings of fact set forth above, it is hereby **ORDERED** as follows:

1. **DISCHARGE OF SHOW CAUSE ORDER AS TO THE DEBTORS.** All matters raised in the Show Cause Order are hereby resolved to the court's satisfaction, with respect to the Whites and their actions pertaining to the 1% conveyance. No further action is required of the Whites in this matter.

2. **SHOW CAUSE ORDER/HEARING AS TO NORTH AMERICAN FORECLOSURE, LLP, DAVID CURTIS, AND JIREH CAPITAL SERVICES, LLC.** The court has heard evidence suggesting that **North American Foreclosure, LLP** (who may be at 2700 S. Figueroa St., 11th Floor, Los Angeles, CA 90007-3256) and actors associated therewith, **David Curtis** (who may be at 301 Wedgewood Lane, Cedar Hill, Texas 75104)**, and **Jireh Capital Services, LLC** (who may be at 445 E. FM 1382 Suite 3, Cedar Hill, Texas 75104-6046 or at _20 N. Joe

Wilson, Suite., 1412, Cedar Hill, Texas 75104 or at 1431 Greenway Drive, Suite 800, Irving, Texas 75038) may have committed acts that constituted willful violations of the automatic stay in the Whites' bankruptcy case, pursuant to section 362 of the Bankruptcy Code. The court hereby **ORDERS** North American Foreclosure, LLP, David Curtis, and Jireh Capital Services, LLC to appear before this court on **<u>January 9, 2008, at 10:00 a.m.,</u>** Courtroom of the Honorable Stacey G.C. Jernigan, United States Bankruptcy Judge, 14th Floor, 1100 Commerce Street, Dallas, Texas 75242, and **SHOW CAUSE** why they shall not be found to have violated section 362 and potentially liable for damages pursuant to section 362(k). This hearing shall be in the nature of a pre-trial hearing conference, at which the court will hear arguments as to what discovery might be needed by any particular party and the timing needs/preferences for an ultimate evidentiary hearing on the merits.

    3. **Section 362 (d) & (j) Relief as to HomEq.** Pursuant to section 362(j) of the Bankruptcy Code, on request of a party, the court shall issue an order under section 362(c), confirming that the automatic stay has been terminated. The court can also, pursuant to section 362(d), annul the stay or retroactively validate an act that may have technically been committed while the automatic stay was in place. HomEq has, in its pleadings filed herein, essentially made a request for this type of relief.

18

This court concludes that any attempted transfer of a 1% interest in the Homestead to Chaka Casey was invalid, fictitious and a legal nullity.  Chaka Casey has submitted a sworn affidavit confirming this.  Accordingly, pursuant to sections 362(c), (d), (j), and the court's additional authority under section 105, the court hereby validates actions taken by HomEq with regard to the Homestead, after the termination of the stay as to HomEq in December 2006.  Specifically, HomEq's February 2006 foreclosure sale was in no way a violation of the automatic stay, either in this case or the case of Chaka Casey, and recordation of a substitute trustee's deed and other acts to effectuate the foreclosure sale are in no way prohibited.[18]

---

[18]Just to be clear, the court finds that no transfer of a property interest in the Homestead occurred as to Chaka Casey. The Whites had no authority to convey an interest in their Homestead to a third party without an order from this court.  The act would be a violation of, among other authority, sections 362 and 363 of the Bankruptcy Code.  The fact that this court had granted relief from the automatic stay to *HomEq* with regard to the Homestead, *for HomEq to pursue its state law rights with regard to the Homestead*, does not alter that reality.  Chaka Casey has submitted a credible sworn affidavit that she has no interest in the Homestead (and had no role in this matter whatsoever)—meaning that no declaratory judgment action or other adversary proceeding is procedurally necessary here to establish her lack of interest in the Homestead.  Thus, this court is in the position to hold that HomEq's actions have not violated the stay in Chaka Casey's case because there was no property interest of hers involved.  This court, as a court with jurisdiction over HomEq and the Whites' property interests, has the jurisdiction and power to interpret the applicability of the automatic stay in the Chaka Casey case as to HomEq's actions and this property. *See generally Hunt v. Bankers Trust Co.*, 799 F.2d 1060, 1069 (5th Cir. 1968) (citing *In re Baldwin-United Corp. Litigation*, 765 F.2d 343 (2d Cir. 1985)).

19

**IT IS SO ORDERED.**

The court also is taking the following additional measures with regard to these matters:

**A. Reporting of Possible Bankruptcy Crimes (18 U.S.C. § 3057; 18 U.S.C. § 152; 18 U.S.C. § 157).** Pursuant to section 3057 of title 18, any judge (among others in the bankruptcy system) having reasonable grounds for believing a violation of laws of the United States relating to insolvent debtors has been committed, or that an investigation should be had in connection therewith, shall report to the appropriate United States attorney, all facts and circumstances of the case, the names of the witnesses and the offense or offenses believed to have been committed. The duties of the United States attorney after such a report is made are further elaborated in the statute. This Memorandum Opinion is being forwarded to the United States Attorney for the Northern District of Texas, as this court has reasonable grounds to believe that a violation of one or more of the following provisions of title 18 ("Bankruptcy Crimes Statutes") may have been committed by North American Foreclosure, LLP and individuals associated therewith, David Curtis, and Jireh Capital Services, LLC: 18 U.S.C. §§ 152(1), (5), (6), (7), (8) & 157. The witnesses to this matter include at least the Debtors, HomEq, and Chaka Casey, as set forth in this Memorandum Opinion. This court believes that other federal and state crimes may be

20

implicated.

**B.** **Courtesy Copy to the Chief Judge of the United States Bankruptcy Court for the Central District of California, Los Angeles Division.** This court is transmitting a courtesy copy of this opinion to the Chief Judge of the United States Bankruptcy Court for the Central District of California, Los Angeles Division. This court is unaware of the exact magnitude of the problems described in this matter by HomEq and/or whether the courts in California have reason to be fully aware of these issues (since the Warranty Deeds described herein are likely not being filed in cases of the stranger *pro se* debtors). However, under the assumption that knowledge of what other courts are hearing can only help and not hurt, this Memorandum Opinion is being forwarded.

**C.** **Courtesy Copy to the Texas Attorney General**. This court is transmitting a courtesy copy of the Memorandum Opinion to the Texas Attorney General for it to consider whether further investigations on its part are warranted.

**D.** **Plea to the Consumer Debtor Bankruptcy Bar.** The court urges attorneys representing consumer debtors to warn their clients of the apparent schemes being solicited to debtors such as the Whites. While this court is of the view in this matter that the Whites were naive "bit characters" who did not fully understand the consequences of their actions and did not set out

21

to defraud HomEq, this may not always be the case.  The Whites have lost $1,300 and have not saved their home.  This court suspects other debtors have lost even more.  The court hopes that it will become a standard part of consumer debtor representation in this district to warn debtors of the hazards of dealing with some of the non-attorney Bankruptcy Servicers that are offering the illusion of relief from foreclosure for a steep fee.[19]

### END OF MEMORANDUM OPINION AND ORDER ###

---

[19] This court does not mean to cast aspersions on some of the legitimate consumer debt counselors who act wholly within the bounds of the law.